IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MARC THIELMAN, SENATOR
DENNIS LINTHICUM, SENATOR
KIM THATCHER, JEFF KROPF,
MARK ANDERSON, CHUCK
WIESE, JANICE DYSINGER,
STEVEN MCGUIRE, RICK RILEY,
GABRIEL BUEHLER, DON
POWERS, BEN EDTL, and JOHN
SMALL,

                Plaintiffs,

    v.

TINA KOTEK, in her official and personal
capacities as Governor of Oregon;
LAVONNE GRIFFIN-VALADE, in her
official and personal capacities as Oregon
Secretary of State; and MOLLY WOON,
in her official and personal capacities as
Elections Director,

                Defendants.

No. 3:23-cv-01639-HZ

OPINION & ORDER

Stephen J. Joncus
Joncus Law P.C.
13202 SE 172nd Ave Ste 166 #344
Happy Valley, OR 97086

      Attorney for Plaintiffs

Ellen Rosenbloom
Attorney General
Thomas H. Castelli
Brian S. Marshall
Senior Assistant Attorneys General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201

      Attorneys for Defendants

HERNÁNDEZ, District Judge:

      Plaintiffs Marc Thielman, Senator Dennis Linthicum, Senator Kim Thatcher, Jeff Kropf, Mark Anderson, Chuck Wiese, Janice Dysinger, Steven McGuire, Rick Riley, Gabriel Buehler, Don Powers, Ben Edtl, and John Small bring this civil rights action against Defendants Tina Kotek, Oregon's Governor; LaVonne Griffin-Valade, Oregon's Secretary of State; and Molly Woon, Oregon's Elections Director. Plaintiffs allege that Defendants—in their official and personal capacities—violated their First Amendment right of free speech in developing a system to monitor harmful information about elections.[1] Defendants move to dismiss this case, arguing that Plaintiffs do not have standing and have failed to state a claim.[2] Because Plaintiffs lack standing, the Court grants Defendants' motion to dismiss for lack of subject matter jurisdiction.

///

---

[1] In their Amended Complaint, Plaintiffs also brought an Ultra Vires claim. In their Opposition to the Motion to Dismiss, Plaintiffs have agreed to dismiss this claim. Pl. Opp'n. 7, ECF 35.
[2] Plaintiffs also address standing in their motion for a preliminary injunction, and the parties cross-reference evidence filed in support of that motion in their briefing. Accordingly, the Court has considered it in resolving this motion.

## BACKGROUND

This case involves the Oregon Secretary of State's recent request for proposals ("RFP") to "contract with a vendor to help provide a suite of products to identify and mitigate harmful information online as it relates to elections (mis-, dis-, and mal-information, or 'MDM').[3] Am. Compl. Ex. 1 ("2023 RFP") at 4, ECF 29. According to the RFP, elections officials and voters are being targeted by MDM on the dark web and social media, creating a climate of "fear and uncertainty around elections." *Id.* at 4; Am. Compl. Ex. 2 at 1. To "promote accurate information regarding election administration and combat MDM," the Oregon Elections Divisions is seeking assistance to "track, follow, and trace all of the threats." 2023 RFP at 4.  Specifically, it seeks a "suite of products to identify, advise, and methods to combat harmful MDM information online," including:

- Media monitoring and threat detection services to offer a comprehensive view of the landscape;
- Providing early notification systems to identify MDM and target MDM activity; and
- Guidance on effective measures to ensure the most effective possible promotion of accurate information.

*Id.* at 7. The system must also provide a way to present "factual material and counter the erosion of trust in public institutions and elections systems" along with tracking solutions for the elections team to "better understand MDM trends, narratives, and potential opportunities to combat MDM." *Id.* The system must also "provide real-time information regarding threats to property and potential threats to life," which "will then be shared according to SOS-defined policies for escalation to law enforcement and potential notification of affected parties." *Id.*

---

[3] The parties do not dispute that the RFP—which is attached to the Complaint—is properly incorporated by reference. *See United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) (holding a document "may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim").

Essentially, the Secretary of State's office seeks a system for monitoring MDM on social and online media so that it can promptly respond to misinformation and to any possible threats to life or property.

The Secretary of State has identified Logically AI as a suitable vendor for the project and is pursuing a final contract with it for the 2023 RFP. Belant Decl. ¶ 15, ECF 24. The Secretary previously awarded Logically AI the contract for the 2022 iteration of the RFP. Am. Compl. ¶ 38.

In Plaintiffs view, the RFP represents a "dystopian censorship project" intended to silence its critics by quashing speech it decides is not true or is misleading. Am. Compl. ¶ 1. Plaintiffs emphasize in their complaint that the Secretary's office plans to share information with relevant law enforcement agencies. Am. Compl. ¶ 33. They also highlight the RFP's use of "war-like rhetoric," emphasizing words like "combat," "target," "threat," disarm," and "countermeasures." Am. Compl. ¶¶ 30–34. According to Plaintiffs, "they are being characterized as war-time enemies for exercising their fundamental right to free speech." Am. Compl. ¶ 34. Plaintiffs also allege that the Secretary does not need surveillance to promote accurate information. Am. Compl. ¶ 35. Thus, "the purpose of the Secretary of State's RFP, by its very terms, is to intimidate and silence criticism from the public." Am. Compl. ¶ 35.

Plaintiffs—who are current and former elected officials, members of the media, and Oregon residents—allege that the RFP violates their First Amendment right to free speech because of its chilling effect. Am. Compl. ¶ 53. Plaintiffs are "educated, deeply researched, vocal critics of Oregon's election system." Am. Compl. ¶ 42. They allege that they will "each be targeted for exercising their First Amendment right to free speech by Defendants with their new artificial intelligence platform" due to their prominence in their election integrity efforts. Am.

Compl. ¶¶ 42, 43. Plaintiffs also allege that people who know of Oregon's MDM surveillance system "will curtail their speech to avoid being targeted," including some of the Plaintiffs in this case. Am. Compl. ¶ 47.

In supporting declarations, Plaintiffs offer more specific fears related to the RFP. Most declarations express concern that the public may fear retaliation by the Oregon government for speaking out on election issues and avoid speech critical of Oregon's election system. Litihicum Decl. ¶ 7, ECF 7; Riley Decl. ¶ 7, ECF 8; Powers Decl. ¶¶ 6–7, ECF 10; Kropf Decl. ¶ 10, ECF 11; Dysinger Decl. ¶ 15, ECF 12; Thielman Decl. ¶ 5, ECF 13; Anderson Decl. ¶ 7, ECF 14; Thatcher Decl. ¶ 5, ECF 15; Edtl. Decl. ¶ 5, ECF 17; Buehler Decl. ¶ 7, ECF 18. Others suggest that the State will use the RFP to censor speech it disagrees with. Powers Decl. ¶¶ 6–7; Dysinger Decl. ¶ 9; McGuire ¶ 2, ECF 16; Edtl. Decl. ¶ 5. Only a few Plaintiffs express concern that they will be targeted specifically. For example, Janice Dysinger "fear[s] that Oregon will use its new capabilities under RFP 7470 to target [her] due to [her] work to expose election fraud in Oregon." Dysinger Decl. ¶ 14. Jeff Kropf—a talk show radio host—believes his show and social media will be monitored and that his right to express himself is damaged by the State's action. Kropf Decl. ¶¶ 8–9. Don Powers states: "I find myself curtailing my own expression, opinions, and ideas. Powers Decl. ¶ 7; *see also* Wiese Decl. ¶¶ 4–5 (explaining that he regularly voices concerns over Oregon elections and is concerned about having to defend himself against the state for saying things that "contradict the official narrative of the regime"), ECF 9.

## STANDARDS

A motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(1) addresses the court's subject matter jurisdiction. The party asserting jurisdiction bears the burden of proving that the court has subject matter jurisdiction over his or her claims. *Kokkonen v.*

*Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). A challenge to Article III standing is appropriately raised pursuant to Rule 12(b)(1). *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011) ("[L]ack of Article III standing requires dismissal for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).") (emphasis omitted); *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010) ("Because standing and ripeness pertain to federal courts' subject matter jurisdiction, they are properly raised in a Rule 12(b)(1) motion to dismiss.").

In evaluating a facial attack under Rule 12(b)(1), the court accepts all factual allegations in the complaint as true and determines whether they are sufficient to invoke federal jurisdiction. *Lacano Invs., LLC v. Balash*, 765 F.3d 1068, 1071 (9th Cir. 2014). The court does not accept legal conclusions as true, even if they are "cast in the form of factual allegations." *Id.* (internal quotations omitted).

A Rule 12(b)(1) motion may also attack the substance of the complaint's jurisdictional allegations even though the allegations are formally sufficient. *See Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 979-80 (9th Cir. 2007) (court treats motion attacking substance of complaint's jurisdictional allegations as a Rule 12(b)(1) motion); *Dreier v. United States*, 106 F.3d 844, 847 (9th Cir. 1996) ("[U]nlike a Rule 12(b)(6) motion, a Rule 12(b)(1) motion can attack the substance of a complaint's jurisdictional allegations despite their formal sufficiency[.]") (internal quotation omitted). Additionally, the court may consider evidence outside the pleadings to resolve factual disputes. *Robinson v. United States*, 586 F.3d 683, 685 (9th Cir. 2009); *see also Dreier*, 106 F.3d at 847 (a challenge to the court's subject matter jurisdiction under Rule 12(b)(1) may rely on affidavits or any other evidence properly before the court).

///

**DISCUSSION**

Defendants move to dismiss this case, arguing Plaintiffs lack standing under Article III. Defs. Mot. Dismiss 6–10, ECF 32. First, Defendants argue that Plaintiffs' injury is too speculative to support standing. *Id.* at 7. Second, Defendants contend Plaintiffs cannot manufacture injury to support standing. *Id.* The Court agrees.

Article III of the Constitution limits the subject matter jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. "[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). A plaintiff must show three elements to establish standing. First is "an injury in fact," i.e., "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* at 560 (quotation marks and citations omitted). Second, that injury must be "fairly traceable to the challenged action of the defendant," and not "the result of the independent action of some third party not before the court." *Id.* (quotation marks and alternations omitted). Third, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 561 (internal quotations omitted). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Id.* (citations omitted).

In arguing Plaintiffs have failed to establish injury in fact from the proposed MDM contract, Defendants rely heavily on *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013). In *Clapper*, the respondents—attorneys and human rights, labor, legal, and media organizations—brought a constitutional challenge to Section 702 of the Foreign Intelligence Surveillance Act ("FISA"). *Id.* at 401, 406. Section 702 authorizes the surveillance of individuals who are not "United States persons" to acquire foreign intelligence. *Id.* at 401. The respondents

alleged that their work required them to "engage in sensitive international communications with individuals who they believe[d] [were] likely targets of surveillance" under Section 702. *Id.* at 401, 406. The Supreme Court, however, determined that the respondents lacked Article III standing, finding the assertion that there was a "objectively reasonable likelihood that their communications will be acquired under [Section 702] . . . . [was] too speculative to satisfy the well-established requirement that threatened injury must be 'certainly impending.'" *Id.* at 401. The Court further rejected the respondent's argument that they had a present injury because Section 702 "forced them to take costly and burdensome measures to protect the confidentiality of their international communications," emphasizing that "the respondents cannot manufacture standing by choosing to make expenditures based on hypothetical future harm that is not certainly impending." *Id.* at 402.

The Supreme Court also addressed standing in a challenge to a government surveillance program in *Laird v. Tatum*, 408 U.S. 1 (1972). There, the plaintiffs claimed "their rights were being invaded" by the Army's data-gathering system, which collected information about public activities with potential for civil disorder. *Id.* at 2, 6. They obtained this information from news media and publications of general circulation, intelligence agents in the field attending public meetings, and civilian law enforcement agencies. *Id.* at 6. The Supreme Court determined that the plaintiffs could not establish standing. The Court recognized that a First Amendment violation can arise from the chilling effect of government action. But it found that the chilling effect was insufficient for standing purposes where it arose "merely from the individual's knowledge that a governmental agency was engaged in certain activities or from the individual's concomitant fear that, armed with the fruits of those activities, the agency might in the future take some other additional action detrimental to that individual." *Id.* at 11 (comparing the

plaintiff's claims with other cases where "the challenged exercise of governmental power was regulatory, proscriptive, or compulsory in nature, and the complainant was either presently or prospectively subject to the regulations, proscriptions, or compulsions that he was challenging"). "'Allegations of a subjective "chill" are not an adequate substitute for a claim of specific present objective harm or a threat of future harm[.]'" *Id.* at 13–14 (quoting *United Public Workers of Am. (C.I.O.) v. Mitchell*, 330 U.S. 75, 89 (1947)).

Similarly here, Plaintiffs allege a broad, subjective chilling of their speech. As in *Laird*, Plaintiffs' injuries appear to arise merely from their knowledge that the Secretary of State is gathering publicly-available information in order to respond to what it deems is election mis-, mal-, and disinformation. They highlight "war-like rhetoric" in the RFP and make broad allegations that they worry they will be targeted or censored. But they do not allege or demonstrate that any of them have been individually targeted, that any action has been taken against them by the Secretary, that their speech has been censored by the State, or that the system developed by the RFP is capable of such actions. Indeed, most merely allege that some Oregonians might self-censor because of the MDM program. Litihicum Decl. ¶ 7; Riley Decl. ¶ 7; Powers Decl. ¶¶ 6–7; Kropf Decl. ¶ 10; Dysinger Decl. ¶ 15; Thielman Decl. ¶ 5; Anderson Decl. ¶ 7; Thatcher Decl. ¶ 5; Edtl. Decl. ¶ 5; Buehler Decl. ¶ 7. And only a few individual Plaintiffs claim to have actually censored themselves. Dysinger Decl. ¶ 14; Kropf Decl. ¶ 8; Powers Decl. ¶ 7; Wiese Decl. ¶¶ 4–5. In other words, Plaintiffs have not demonstrated how the State's information-gathering program amounts to censorship or otherwise chills their speech other than their subjective worry about the existence of the program. Plaintiffs cannot manufacture standing by inflicting harm on themselves. *See Wright v. Serv. Emps. Int'l Union Loc.* 503, 48 F.4th 1112, 1119 (9th Cir. 2022).

Further, Plaintiffs' assertion that they may be prosecuted under Or. Rev. Stat.

§ ("O.R.S.") 260.537 through information gathered from the program fares no better. *See* Powers

Decl. ¶ 7 ("I am concerned about having to defend myself in court against unfounded claims

simply because something I said is misrepresented or is not in alignment with the State's

position."); Thielman Decl. ¶ 5 (stating that O.R.S. 260.537 combined with the Secretary's

program "will cause many to hedge their comments because they do not want to be targeted by

Oregon's government"). This alleged future injury is too speculative to constitute injury for

standing purposes. *See Clapper*, 568 U.S. at 414 (finding the "respondents' speculative chain of

possibilities does not establish that injury based on potential future surveillance is certainly

impending or is fairly traceable to § 1881a"). Accordingly, Plaintiffs' claim fails for lack of

Article III standing.

Because Plaintiffs lack Article III standing, the Court will not address whether Plaintiffs

have stated a claim for relief. *See Tunac v. United States*, 897 F.3d 1197, 1201 (9th Cir.

2018) ("[A] federal court generally may not rule on the merits of a case without first determining

that it has jurisdiction.") (internal quotations omitted). Because the Court lacks subject matter

jurisdiction over this case, it must be dismissed.

## CONCLUSION

The Court GRANTS in part Defendants' Motion to Dismiss [32] and dismisses this case

for lack of jurisdiction.

IT IS SO ORDERED.

DATED:_____May 24, 2024_____.

_____
MARCO A. HERNÁNDEZ
United States District Judge